In the MATTER OF DISCIPLINARY PROCEEDINGS
AGAINST Michael R. INGLIMO,
Attorney at Law:

OFFICE OF LAWYER REGULATION,
Complainant-Appellant-Cross-Respondent,

v.

Michael R. INGLIMO,
Respondent-Respondent-Cross-Appellant.

Supreme Court

*No. 2005AP718–D. Oral argument April 26, 2007.
—Decided October 18, 2007.*

2007 WI 126

(Also reported in 740 N.W.2d 125.)

For the complainant-appellant-cross-respondent, there were briefs filed by *Matthew F. Anich,* Ashland, and oral argument by *Matthew F. Anich.*

For the respondent-respondent-cross-appellant, there were briefs filed by *Michael R. Inglimo,* Superior, and oral argument by *Michael R. Inglimo.*

¶ 1. PER CURIAM. In this disciplinary proceeding, the referee concluded that the OLR had proven violations on 10 of the 15 counts contained in the complaint filed by the Office of Lawyer Regulation (OLR). Based on those violations, the referee recommended that Attorney Michael Inglimo's license to practice law in Wisconsin be suspended for 18 months. Both the OLR and Attorney Inglimo appeal from the referee's report and recommendation.

¶ 2. After independently reviewing the record, we determine that the facts as found by the referee demonstrate violations of the Rules of Professional Conduct for 14 of the 15 counts alleged by the OLR. We conclude that Attorney Inglimo's professional misconduct requires a three-year suspension of his license to practice law in this state. We agree with the referee's recommendation that Attorney Inglimo should be required to submit to random drug tests for a period of one year prior to the reinstatement of his license. Finally, we disagree with the referee's recommendation that the amount of the costs of this disciplinary proceeding to be paid by Attorney Inglimo should be reduced by one-fifteenth. We determine that Attorney Inglimo should be required to pay the full costs of this proceeding, which were $42,400.96 as of May 10, 2007.

¶ 3. After a lengthy period of investigation, on March 18, 2005, the OLR filed a 15–count complaint against Attorney Inglimo. Attorney Curry First was subsequently appointed as referee. After the parties conducted discovery, the OLR filed a motion for summary judgment. Ultimately, the referee granted summary judgment to the OLR on seven counts, granted summary judgment to Attorney Inglimo on one count and denied summary judgment to either party on seven counts. An evidentiary hearing was held on November 29, 2005. Both parties submitted post-hearing briefs, as well as proposed findings of fact and conclusions of law.

¶ 4. The referee submitted a lengthy report containing his findings of fact and conclusions of law, as well as his recommendations for discipline. The findings of fact and conclusions of law are summarized as briefly as possible below.

¶ 5. When reviewing the referee's report, we will affirm the referee's findings of fact unless they are clearly erroneous. *See In re Disciplinary Proceedings Against Sosnay,* 209 Wis. 2d 241, 243, 562 N.W.2d 137 (1997). We review the referee's conclusions of law, however, on a de novo basis. *See In re Disciplinary Proceedings Against Carroll,* 2001 WI 130, ¶ 29, 248 Wis. 2d 662, 636 N.W.2d 718.

¶ 6. Attorney Inglimo was admitted to the practice of law in Wisconsin in September 1985. He practiced in the Superior area.

¶ 7. Counts 1 and 2 relate to Attorney Inglimo's representation of L.K in a criminal case between April 2000 and January 2001. During this representation in October 2000, Attorney Inglimo had sexual relations with L.K.'s girlfriend in L.K.'s presence and with L.K.

also engaging in sexual relations with his girlfriend during the sexual encounter. The referee further found, however, that there was no evidence that during the encounter there was any intimate physical contact between Attorney Inglimo and L.K.

¶ 8. Count 1 of the OLR's complaint alleged that by having sexual relations with L.K.'s girlfriend in L.K.'s presence and with L.K. participating in the encounter, Attorney Inglimo had violated SCR 20:1.8(k)(2).[1] Although the referee found that there had been a three-way sexual encounter involving L.K., his girlfriend and Attorney Inglimo, he concluded that there was no violation of SCR 20:1.8(k)(2) because there was no evidence that Attorney Inglimo and his client, L.K., had "sexual relations" as that term is defined in the rule. Specifically, there was no evidence that Attorney Inglimo and L.K. engaged in sexual intercourse or intentionally touched each other's intimate parts.

¶ 9. One of the conditions of bail in L.K.'s criminal case was that he could not use or possess any controlled substances. In addition, Wis. Stat. § 969.03(2) (1999–2000)[2] provided that "[a]s a condition of release in all cases, a person released under this section shall not commit any crime." Possession and use of marijuana were criminal acts in the State of Wisconsin. Wis. Stat. § 961.41(3g)(e). Beginning in 1998, Attorney Inglimo and L.K. regularly went out drinking at various taverns. In addition to drinking, Attorney Inglimo

---

[1] SCR 20:1.8(k)(2) provides that "[a] lawyer shall not have sexual relations with a current client unless a consensual sexual relationship existed between them when the lawyer-client relationship commenced."

[2] All subsequent references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise indicated.

occasionally used marijuana with L.K. Specifically, in October 2000 while L.K. was out on bail, L.K. went to Attorney Inglimo's house, where the two of them used cocaine and smoked marijuana.

¶ 10. A couple of months later, a week or two before his criminal trial, L.K. returned to Attorney Inglimo's house to discuss the upcoming trial. L.K. testified that Attorney Inglimo was under the influence of drugs at the time, because his eyes were dilated, he could not focus, and he was "antsy." L.K. stated that he could tell when Attorney Inglimo had used drugs because he had previously used drugs with Attorney Inglimo on past occasions.

¶ 11. The referee found, based on L.K.'s testimony, that Attorney Inglimo had been high on drugs during L.K.'s trial, that Attorney Inglimo was not prepared, and that he had not represented L.K. adequately at the trial.

¶ 12. The referee concluded that this conduct by Attorney Inglimo constituted a violation of SCR 20:8.4(b).[3] The referee acknowledged that using marijuana is a crime under Wisconsin law, but he did not believe that marijuana use, by itself, reflected adversely on a lawyer's honesty, trustworthiness or fitness as a lawyer in other respects. He believed that the OLR had to prove a nexus between Attorney Inglimo's criminal act of marijuana use and his provision of legal services to L.K. With respect to Count 2, the referee concluded that the evidence showed that Attorney Inglimo had been high during L.K.'s criminal trial and that Attorney Inglimo's performance as an attorney had been affected

---

[3] SCR 20:8.4(b) provides that it is professional misconduct for a lawyer to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects."

thereby. He did not base his legal conclusion of a violation of SCR 20:8.4(b) on the fact that Attorney Inglimo, by using marijuana with L.K., had aided and abetted L.K. to violate a condition of his bail. The referee stated that Count 2 was drafted as alleging a criminal act of using drugs, rather than as alleging a criminal act of aiding and abetting L.K. to violate his bail condition.

¶ 13. Counts 3 through 6 relate to Attorney Inglimo's use of his client trust account and his failure to maintain proper trust account records. The referee's factual findings on these counts include that Attorney Inglimo wrote two checks out of his client trust account totaling $1,327 to purchase a car for himself. Attorney Inglimo claimed that these funds belonged to his mother, for whom he had previously handled a real estate matter, and that she gave the funds to him so that he could purchase the car. Based on the OLR's reconstruction of Attorney Inglimo's client trust account transactions, however, the referee found that Attorney Inglimo's trust account checks for the car had exceeded any trust account funds belonging to his mother by at least $150. Thus, Attorney Inglimo had drawn on funds belonging to other clients.

¶ 14. In addition, OLR's reconstruction demonstrated that as of December 31, 2001, several clients and Attorney Inglimo himself had negative balances in the trust account. Indeed, between January 1, 1999, and December 31, 2001, Attorney Inglimo used funds on deposit for clients with positive balances to cover at least $386.05 of disbursements for those with negative balances.

¶ 15. For many years Attorney Inglimo maintained personal funds in his client trust account to act as a "cushion" against overdrafts. Prior to May 2004,

81

Attorney Inglimo kept no written records that would show what amounts of personal funds were in the client trust account. He made more than $1,500 in disbursements from his trust account for personal expenses when he had no way to determine whether he had sufficient personal funds in the trust account to cover those disbursements.

¶ 16. Attorney Inglimo also did not maintain subsidiary client ledgers for individual clients and did not keep a running balance of receipts, disbursements and the amount remaining in the trust account for each client. He did not record deposits in the trust account checkbook register and kept no other receipts journal showing the sources and dates of deposits. Attorney Inglimo did not keep a running balance for his trust account and did not perform monthly reconciliations between his trust account balance and the bank statements.

¶ 17. Despite his failure to keep the trust account records required by former SCR 20:1.15(e),[4] Attorney

---

[4] Former SCR 20:1.15 applies to misconduct committed prior to July 1, 2004. Former SCR 20:1.15(e) provided:

> (e) Complete records of trust account funds and other trust property shall be kept by the lawyer and shall be preserved for a period of at least six years after termination of the representation. Complete records shall include: (i) a cash receipts journal, listing the sources and date of each receipt, (ii) a disbursements journal, listing the date and payee of each disbursement, with all disbursements being paid by check, (iii) a subsidiary ledger containing a separate page for each person or company for whom funds have been received in trust, showing the date and amount of each receipt, the date and amount of each disbursement, and any unexpended balance, (iv) a monthly schedule of the subsidiary ledger, indicating the balance of each client's account at the end of each month, (v) a determination of the cash balance (checkbook balance) at the end of each month, taken from the cash receipts and cash disbursement journals and a reconciliation of the cash

Inglimo certified on his annual state bar dues statements for fiscal years 1999–2004 that he had complied with each of the trust account record-keeping requirements. Each of these certifications was false.

¶ 18. Based on these factual findings, the referee concluded that Attorney Inglimo had violated former SCR 20:1.15(a)[5] (Counts 3 and 4) by failing to hold in

balance (checkbook balance) with the balance indicated in the bank statement, and (vi) monthly statements, including canceled checks, vouchers or share drafts, and duplicate deposit slips. A record of all property other than cash which is held in trust for clients or third persons, as required by paragraph (a) hereof, shall also be maintained. All trust account records shall be deemed to have public aspects as related to the lawyer's fitness to practice.

[5] Former SCR 20:1.15(a) provided: Safekeeping property.

(a) A lawyer shall hold in trust, separate from the lawyer's own property, that property of clients and third persons that is in the lawyer's possession in connection with a representation or when acting in a fiduciary capacity. Funds held in connection with a representation or in a fiduciary capacity include funds held as trustee, agent, guardian, personal representative of an estate, or otherwise. All funds of clients and third persons paid to a lawyer or law firm shall be deposited in one or more identifiable trust accounts as provided in paragraph (c). The trust account shall be maintained in a bank, savings bank, trust company, credit union, savings and loan association or other investment institution authorized to do business and located in Wisconsin. The trust account shall be clearly designated as "Client's Account" or "Trust Account" or words of similar import. No funds belonging to the lawyer or law firm, except funds reasonably sufficient to pay or avoid imposition of account service charges, may be deposited in such an account. Unless the client otherwise directs in writing, securities in bearer form shall be kept by the attorney in a safe deposit box in a bank, savings bank, trust company, credit union, savings and loan association or other investment institution authorized to do business and located in Wisconsin. The safe deposit box shall be clearly designated as "Client's Account" or "Trust Account" or words of similar import. Other property of a client or third person shall be identified as such and appropriately safeguarded. If a lawyer also licensed in another state is entrusted

83

trust at least $386.05 in funds belonging to clients or third persons and by depositing and co-mingling his personal funds with client funds in his trust account. The referee also concluded that Attorney Inglimo had failed to keep the necessary trust account records, in violation of former SCR 20:1.15(e) (Count 5). Further, the referee determined that Attorney Inglimo had violated former SCR 20:1.15(g)[6] (Count 6) by falsely certifying on his state bar annual dues statements that he was in compliance with the trust account record-keeping requirements.

¶ 19. Count 7 related to improper trust account disbursements made by Attorney Inglimo between 1999 and 2001. Based on the OLR's reconstruction of the

---

with funds or property in connection with an out-of-state representation, this provision shall not supersede the trust account rules of the other state.

[6] Former SCR 20:1.15(g) provided:

(g) A member of the State Bar of Wisconsin shall file with the State Bar annually, with payment of the member's State Bar dues or upon such other date as approved by the Supreme Court, a certificate stating whether the member is engaged in the private practice of law in Wisconsin and, if so, the name of each bank, trust company, credit union or savings and loan association in which the member maintains a trust account, safe deposit box, or both, as required by this section. Each member shall explicitly certify therein that he or she has complied with each of the record-keeping requirements set forth in paragraph (e) hereof. A partnership or professional legal corporation may file one certificate on behalf of its partners, associates, or officers who are required to file under this section. The failure of a member to file the certificate required by this section is grounds for automatic suspension of the member's membership in the State Bar in the same manner as provided in SCR 10.03(6) for nonpayment of dues. The filing of a false certificate is unprofessional conduct and is grounds for disciplinary action. The State Bar shall supply to each member, with the annual dues statement or at such other time as directed by the Supreme Court, a form on which the certification must be made and a copy of this rule.

trust account transactions, during that time period Attorney Inglimo's disbursements to himself and to third parties on behalf of clients P.K. and K.K. exceeded the funds on deposit for them in Attorney Inglimo's trust account by at least $2,661.47. Attorney Inglimo also disbursed $33 for client T.P. when he knew there were no funds on deposit for her in his trust account. He likewise disbursed $94 to obtain a preliminary hearing transcript in L.K.'s criminal case when he knew that there were no funds on deposit for L.K. in the trust account.

¶ 20. The referee concluded that these facts demonstrated that Attorney Inglimo had engaged in conduct involving dishonesty and misrepresentation, in violation of SCR 20:8.4(c).[7]

¶ 21. Count 8 involved Attorney Inglimo's representation of M.S. in a divorce matter between September 27, 2001, and August 7, 2002. M.S.'s wife, K.S., was not represented by counsel. The divorce proceeding was a fairly simple matter because the couple had been separated for several years, they had no children, they had very little property to divide, and apparently the only real dispute involved possession of a camper.

¶ 22. The referee found that during the course of the divorce case Attorney Inglimo developed at least a significant social relationship with K.S. Attorney Inglimo not only met with K.S. at the public library multiple times, but he went to K.S.'s residence on multiple occasions and she came to his house on multiple occasions. Specifically, the referee found that Attorney Inglimo went to a party at K.S.'s residence, that

---

[7] SCR 20:8.4(c) provides that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

he asserted the Fifth Amendment when asked about using a controlled substance at the party, and that he did not tell his client about attending this party. The referee also found, based on the testimony of P.K. and K.K., who were living on Attorney Inglimo's property and were in his home watching a movie on the relevant date, that Attorney Inglimo and K.S. returned to Attorney Inglimo's home late one evening, immediately went into Attorney Inglimo's bedroom, and did not leave the bedroom until morning. The referee further found, based on Attorney Inglimo's admission, that he engaged in a three-way sexual encounter with K.S. and another woman within two weeks after M.S. fired him in August 2002. The cause of the firing was M.S.'s belief that Attorney Inglimo and K.S. were seeing each other and that Attorney Inglimo was not being loyal to him.

¶ 23. The referee also found that M.S. had instructed Attorney Inglimo to provide copies of all communications between Attorney Inglimo and K.S. Attorney Inglimo admits that there were e-mails sent between him and K.S. that were not given to M.S. Attorney Inglimo claims that the e-mails were all business-related and that he deleted them immediately after they were sent or received. He asserted that M.S. never asked to receive copies of the e-mails until after they had been deleted.

¶ 24. The referee did not make a finding that Attorney Inglimo and K.S. were engaging in a sexual relationship during Attorney Inglimo's representation of M.S. because no one testified that they had personally witnessed the two engaging in sex. He did find, however, that Attorney Inglimo's admission of sex with K.S. within a few days after being fired by M.S. showed at least a substantial social relationship during Attor-

ney Inglimo's representation of M.S. and a desire on Attorney Inglimo's part to pursue his own selfish interests.

¶ 25. Based on these factual findings, the referee concluded that Attorney Inglimo had violated SCR 20:1.7(b)[8] because his representation of M.S. may have been materially limited by his own interests and because he never consulted with his client or obtained his client's written consent to his social relationship with K.S.

¶ 26. Count 9 relates to Attorney Inglimo's conviction for misdemeanor possession of tetrahydrocannabinols (THC or marijuana) on January 22, 2003. This conviction was based on Attorney Inglimo's use of marijuana with clients P.K. and K.K. in June 2002. Although Attorney Inglimo was originally charged with several additional counts, he pled guilty to misdemeanor possession of marijuana pursuant to a plea agreement.

¶ 27. The referee concluded that since the conviction was only for possession of marijuana, he did not believe that the conviction by itself supported finding a violation of SCR 20:8.4(b). The referee believed that under SCR 20:8.4(b) the OLR was required to prove a

---

[8] SCR 20:1.7(b) provides: Conflict of interest: general rule.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents in writing after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

nexus between the criminal act of which Attorney Inglimo was convicted (possession of THC) and dishonesty, untrustworthiness or unfitness as a lawyer. He did not believe that there was any such nexus shown in this case. The referee stated that he did not know if his legal conclusion would be different if the conviction had been for marijuana use as opposed to possession, although the referee made a specific factual finding that the conviction was based on a June 2002 videotape showing Attorney Inglimo using marijuana with clients P.K. and K.K.

¶ 28. Count 10 also related to the June 2002 incident. The referee found that during the June 2002 videotaped incident, Attorney Inglimo, P.K. and K.K. also had snorted cocaine using a straw and a mirror. Attorney Inglimo admitted that he had used cocaine occasionally since becoming an attorney, although he said he wasn't sure whether the substance shown on the June 2002 videotape was really cocaine. He claimed that it may have been flour or salt. P.K. and K.K. testified that the substance was indeed cocaine and K.K. stated that she had used cocaine with Attorney Inglimo on other occasions. The referee also found that P.K. and K.K. were clients of Attorney Inglimo.

¶ 29. The referee concluded that Attorney Inglimo's use of cocaine, which he considered more serious than marijuana, with two clients demonstrated that he had committed a criminal act that reflected adversely on his fitness as a lawyer, in violation of SCR 20:8.4(b). Attorney Inglimo has not appealed this violation.

¶ 30. Count 11 alleged a violation of SCR 20:8.4(b) for using marijuana with R.W., an adult client, and T.R., a minor. The referee's findings and legal conclusions on this count are somewhat contradictory. The referee essentially found that Attorney Inglimo and R.W. smoked

marijuana together at the apartment of J.S., and that during that evening R.W. engaged Attorney Inglimo to represent her. The referee's factual findings also include a statement that "[T.R.] used marijuana with [J.S.], [R.W.] and Inglimo at [J.S.'s] apartment." He also made a finding that "[J.S.] testified at the time [T.R.] came over in the summer of 2001, there was marijuana exchanged between [T.R.] and Inglimo."

¶ 31. Despite these findings of fact, when discussing his legal conclusions on this count, the referee stated that while he believed that the OLR had met its burden of proof to show that Attorney Inglimo had used marijuana with an adult client, R.W., it had not met its burden of proving marijuana use with T.R. In addition, the referee concluded that marijuana use with an adult client by itself does not constitute a violation of SCR 20:8.4(b) and that because the OLR had not proven that Attorney Inglimo's marijuana use with R.W. had affected any legal services he provided to her, there was no violation of SCR 20:8.4(b) in this instance.

¶ 32. Count 12 alleged that Attorney Inglimo had violated SCR 20:8.4(b) by supplying THC to P.K. The referee found that Attorney Inglimo had in fact supplied marijuana to P.K., one of Attorney Inglimo's clients, citing P.K.'s testimony that Attorney Inglimo had provided marijuana to him on "quite a few" occasions. The referee also noted that Attorney Inglimo had admitted that he had used marijuana with P.K., but when asked at the hearing about supplying marijuana to P.K., Attorney Inglimo asserted his Fifth Amendment rights.

¶ 33. With respect to whether this conduct constituted a violation of SCR 20:8.4(b), the referee repeated his belief that using marijuana, even with a client, may be a criminal act, but it does not constitute a violation

of SCR 20:8.4(b) because it does not, by itself, reflect adversely on the lawyer's fitness. The referee's report continued, however, by stating "But doing so—supplying—to a client is unfitness." Despite this conclusion, the referee nonetheless later indicated that he believed that SCR 20:8.4(b) requires proof that the attorney provided deficient legal services "in circumstances where marijuana use and/or supplying was a primary or secondary cause." Because the OLR did not show how Attorney Inglimo's provision of marijuana to P.K. had affected the legal services Attorney Inglimo rendered, the referee concluded that the OLR had not proven a violation of SCR 20:8.4(b) in Count 12.

¶ 34. Count 13 alleged that Attorney Inglimo's use of marijuana with clients P.K. and K.K. constituted a violation of SCR 20:8.4(b).[9] Since this incident was videotaped, Attorney Inglimo admitted that he had smoked marijuana with P.K. and K.K., and the referee so found.

¶ 35. The referee concluded, however, that because the OLR had not proven that the marijuana use had affected Attorney Inglimo's rendition of legal services to P.K. and/or K.K., there was no adverse reflection on his fitness as a lawyer and no violation of SCR 20:8.4(b).

¶ 36. Count 14 alleged a violation of SCR 20:1.7(b) due to Attorney Inglimo having sexual intercourse with K.K. Attorney Inglimo admitted and the referee found that Attorney Inglimo had sexual intercourse with K.K.

---

[9] This usage of marijuana occurred just prior to Attorney Inglimo engaging in sexual intercourse with K.K., which formed the basis for Count 14. Although it was not definitively settled as to when this incident occurred, it was a different incident than the June 2002 occasion referenced in Counts 9 and 10, when Attorney Inglimo also smoked marijuana and used cocaine with P.K. and K.K.

in the presence of her husband P.K. Attorney Inglimo suggested the arrangement. The encounter was video-taped, with Attorney Inglimo supplying and setting up the videotape equipment. Attorney Inglimo admitted that he had represented P.K., K.K. or both in numerous matters beginning in at least 1997 and that at the time of the videotaped sex act, he had an ongoing attorney-client relationship with P.K. K.K. had clearly been a client of Attorney Inglimo prior to the incident, although Attorney Inglimo contended that she was not a client at the time of the sexual encounter.

¶ 37. Both P.K. and K.K. testified that the sexual intercourse was payment for prior legal services that Attorney Inglimo had rendered to K.K. P.K. testified that the videotaping was done to ensure that there was no dispute that the bill for legal fees had been paid in full. The referee implied that he believed the sex was indeed payment for prior legal services, but he did not make a specific finding of fact to that effect. The referee noted that Count 14 had not charged Attorney Inglimo with obtaining sex as payment for legal services.

¶ 38. The referee did find that K.K. felt terrible about having sex with Attorney Inglimo and that P.K. had not consented.

¶ 39. The referee concluded that Attorney Inglimo's act of sexual intercourse with K.K. was for his own personal interests and that his personal interests may have materially limited his ability to represent P.K. Thus, Attorney Inglimo violated SCR 20:1.7(b).

¶ 40. Count 15 alleged that Attorney Inglimo had failed to notify the OLR and this court within five days of his January 22, 2003 conviction for possession of THC, in violation of SCR 21.15(5)[10]

[10] SCR 21:15(5) provides: Duties of attorneys.

91

and 20:8.4(f).[11] It is undisputed that neither Attorney Inglimo nor his lawyer sent written notice to the OLR's office in Madison or to the clerk of this court. Attorney Michael Ganzer, who represented Attorney Inglimo at the time, did send a facsimile transmission concerning the conviction to Attorney Daniel Snyder, who was a member of the District 11 Professional Responsibility Committee at the time.

¶ 41. There was a dispute between the parties as to whether Attorney Snyder had told Attorney Ganzer to notify only him when the conviction was entered because the OLR and the supreme court were already aware of the criminal charges against Attorney Inglimo. There were multiple affidavits filed on this issue in connection with the summary judgment process before the referee.

¶ 42. The referee ultimately found that Attorney Snyder was not an agent of the OLR who could accept written notice of the conviction on the OLR's behalf. The referee further found that Attorney Snyder had never discussed with Attorney Ganzer the obligation of Attorney Inglimo to send written notice of the conviction to the OLR and this court under SCR 21.15(5). In any event, even Attorney Inglimo acknowledged that no written notice was ever sent to the clerk of the supreme court.

---

(5) An attorney found guilty or convicted of any crime on or after July 1, 2002, shall notify in writing the office of lawyer regulation and the clerk of the Supreme Court within 5 days after the finding or conviction, whichever first occurs. The notice shall include the identity of the attorney, the date of finding or conviction, the offenses, and the jurisdiction. An attorney's failure to notify the office of lawyer regulation and clerk of the supreme court of being found guilty or his or her conviction is misconduct.

[11] SCR 20:8.4(f) provides that it is professional misconduct for a lawyer to "violate a statute, supreme court rule, supreme court order or supreme court decision regulating the conduct of lawyers."

¶ 43. The referee concluded that Attorney Inglimo's failure to provide written notice to the OLR and the clerk of the supreme court had violated SCR 21.15(5), thereby also violating SCR 20:8.4(f). He stated, however, that this was only a technical violation, for which no additional discipline should be imposed.

¶ 44. With respect to the discipline to be imposed, the referee categorized the violations he found into three levels of seriousness. He considered Count 2 (marijuana use with L.K. and impact of drug use on trial performance), Count 8 (improper social relationship with K.S. while representing M.S. in divorce proceeding), and Count 14 (conflict of interest due to sexual encounter with K.K.) as serious violations. He considered the counts relating to Attorney Inglimo's trust account (Counts 3 through 7) to be "less serious violations." He also placed in this "less serious" category Count 10, which charged a violation of SCR 20:8.4(b) for using cocaine with adult client P.K. Finally, as noted above, the referee believed that Count 15 concerning the failure to notify the OLR and this court of his criminal conviction was a technical violation for which no discipline should be imposed.

¶ 45. Ultimately, although he provided a series of individual disciplines for each of violations he found, the sum of which added up to at least a two-year suspension, the referee recommended a total suspension of 18 months. The referee indicated that he believed that Attorney Inglimo's suspension should be lessened somewhat from what would otherwise be appropriate because he is a solo practitioner in the Superior area whose practice will be greatly impacted by any suspension.

¶ 46. The referee also recommended that Attorney Inglimo should be required to submit to random

drug tests for one year prior to the reinstatement of his license. *See In re Disciplinary Proceedings Against Broadnax,* 225 Wis. 2d 440, 444, 591 N.W.2d 855 (1999).

¶ 47. The OLR appeals from the referee's report and recommendation. The OLR first challenges the referee's legal conclusions that Attorney Inglimo's use of controlled substances, as alleged in Counts 9, 11, 12, and 13, did not constitute violations of SCR 20:8.4(b). The OLR contends that the referee found as a matter of fact that Attorney Inglimo had been convicted of possession of THC, that he had used marijuana with clients R.W., P.K., and K.K., and that he had supplied marijuana to P.K. The OLR argues that the criminal acts of possessing, using and supplying marijuana, by themselves, reflect adversely on an attorney's honesty, trustworthiness or fitness as a lawyer in other respects. *In re Disciplinary Proceedings Against Norlin,* 104 Wis. 2d 117, 130, 310 N.W.2d 789 (1981).[12] It asserts that the referee made an error of law when he required the OLR to prove a nexus between the attorney's drug-related activities and particular legal services provided by the attorney.

■

¶ 48. First, we address the referee's interpretation of SCR 20:8.4(b) as requiring that there be a nexus between the attorney's criminal act and the provision of specific legal services. We conclude that this construction is too restrictive a reading of the rule. The language of the rule contains no such requirement of a nexus between the criminal act and legal services rendered by the lawyer. It states only that it is professional misconduct

---

[12] The OLR also correctly notes that an attorney's criminal act can support a SCR 20:8.4(b) violation even if the attorney is never charged or convicted. *Broadnax,* 225 Wis. 2d at 442; *In re Disciplinary Proceedings Against Sandy,* 200 Wis. 2d 529, 546 N.W.2d 876 (1996).

for a lawyer to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects."

¶ 49. Our cases have also repeatedly found violations of SCR 20:8.4(b) even though there has been no connection established between the attorney's criminal act and the attorney's legal services to particular clients. *E.g., In re Disciplinary Proceedings Against Washington,* 2007 WI 65, 301 Wis. 2d 47, 732 N.W.2d 24 (criminal conviction for personal income tax evasion due to failure to report income constituted violation of SCR 20:8.4(b)); *In re Disciplinary Proceedings Against Phillips,* 2007 WI 63, 301 Wis. 2d 33, 732 N.W.2d 17 (criminal conviction for tax evasion due to hiding of loan proceeds to avoid attachment by Internal Revenue Service violated SCR 20:8.4(b)); *In re Disciplinary Proceedings Against Chvala,* 2007 WI 47, 300 Wis. 2d 206, 730 N.W.2d 648 (accepting stipulation that criminal acts of misconduct in public office and making a campaign contribution exceeding the lawful limit violated SCR 20:8.4(b)); *In re Disciplinary Proceedings Against Burke,* 2007 WI 46, 300 Wis. 2d 198, 730 N.W.2d 651 (violations of SCR 20:8.4(b) found for misconduct in public office and obstructing an officer). The connection required for a violation of SCR 20:8.4(b) is not between a criminal act and the lawyer's provision of legal services, but rather is between a criminal act and a lawyer's honesty, trustworthiness or fitness as a lawyer in other respects. A criminal act can reflect adversely on a lawyer's fitness even if the act did not cause the attorney to provide deficient legal services.

¶ 50. With respect to the OLR's argument on appeal, we need not decide in this case whether every

instance of the use of a controlled substance reflects adversely on an attorney's honesty, integrity or fitness as a lawyer.[13] There are additional facts present for each of the counts in the present case to conclude that Attorney Inglimo's possession, use or supplying of marijuana to others reflected adversely on his fitness as a lawyer.

¶ 51. Count 9 of the complaint alleged and the referee found that Attorney Inglimo had been convicted in Douglas County Circuit Court of possessing THC, contrary to Wis. Stat. § 961.41(3g)(e). Attorney Inglimo did not contest the fact of his conviction. The referee also made a specific finding of fact that this conviction "was based on Inglimo's use of THC with clients [P.K. and K.K.] as depicted in a June 2002 videotape." We conclude that using an illegal drug with clients reflects adversely on an attorney's fitness as a lawyer. A lawyer has a professional obligation to support the enforcement of the law and the administration of justice. *See* Preamble to SCR ch. 20 ("A lawyer's conduct should conform to the requirements of the law, both in professional service to clients and in the lawyer's business and personal affairs. . . . A lawyer should demonstrate respect for the legal system and for those who serve it, including judges, other lawyers and public officials.") This obligation is especially important when clients are involved because clients gain their impression of the law and the legal system primarily from their lawyer. A lawyer's use of illegal controlled substances with a

---

[13] We have previously affirmed violations of SCR 20:8.4(b) where the factual basis was an attorney's simple possession or use of cocaine. *E.g., In re Disciplinary Proceedings Against Peterson,* 2006 WI 41, 290 Wis. 2d 74, 713 N.W.2d 101; *Broadnax,* 225 Wis. 2d at 442.

client contradicts this obligation by showing the client that the lawyer has a disregard for the law. That reflects adversely not only on the lawyer's fitness, but on the profession as a whole. Thus, based on the referee's factual findings, we reverse the referee's conclusion of no violation on Count 9 and determine that Attorney Inglimo's possession and use of marijuana in June 2002 with clients P.K. and K.K. constituted a violation of SCR 20:8.4(b).

¶ 52. For the same reason, we conclude that the referee erred in finding no violation of SCR 20:8.4(b) on Count 11. With respect to that count, the referee found that Attorney Inglimo had admitted that he had smoked marijuana with R.W. while she was a client. This is sufficient to support a violation of SCR 20:8.4(b).

¶ 53. The OLR's second argument on appeal also relates to Count 11. That count alleged that Attorney Inglimo had used THC not only with R.W., but also with T.R., who was a minor at the time. As noted above, the referee's report was not consistent on this subject. Although the report contains a finding of fact that Attorney Inglimo used marijuana with T.R., R.W., and J.S. at J.S.'s apartment, the referee concluded that there was no violation of SCR 20:8.4(b). We conclude that the referee's finding of marijuana use with T.R. further supports a conclusion that Attorney Inglimo violated SCR 20:8.4(b), as alleged in Count 11. Attorney Inglimo's use of marijuana with a client, R.W., was enough to support finding such a violation. The fact that Attorney Inglimo also used illegal drugs with a minor simply confirms that legal conclusion and renders it a more serious violation.

¶ 54. Count 12 of the complaint similarly alleged that Attorney Inglimo had supplied marijuana to client P.K. Delivery of marijuana (THC) is a felony in this

state. Wis. Stat. § 961.41(1)(h). The referee found that Attorney Inglimo had used marijuana with P.K. "countless times" and that Attorney Inglimo had supplied marijuana to P.K. "[q]uite a few" times. Just as using marijuana with a client violates SCR 20:8.4(b), delivering marijuana to a client also reflects adversely on a lawyer's fitness. Thus, we reverse the referee's conclusion of no violation as to Count 12.

¶ 55. Count 13 alleged a violation of SCR 20:8.4(b) due to Attorney Inglimo's use of marijuana with clients P.K. and K.K. Although the referee found that the marijuana use had occurred, he concluded that there was no professional misconduct because of the lack of the nexus he erroneously believed was required under the rule. As with Count 9, we reverse the referee's conclusion of no violation and determine that Attorney Inglimo's use of marijuana with clients constituted a violation of SCR 20:8.4(b).

¶ 56. The OLR's next argument focuses on Count 1. It asserts that the referee erred in concluding that there was no violation of SCR 20:1.8(k)(2) for Attorney Inglimo engaging in a three-way sexual encounter with client L.K. and his girlfriend. The OLR does not challenge the referee's factual findings. Rather, it argues that the facts as found by the referee provide clear and convincing evidence of a violation of SCR 20:1.8(k)(2).

¶ 57. The relevant language of SCR 20:1.8(k) is as follows:

(k)(1) In this paragraph:

(i) "Sexual relations" means sexual intercourse or any other intentional touching of the intimate parts of a person or causing the person to touch the intimate parts of the lawyer.

. . .

98

(2) A lawyer shall not have sexual relations with a current client unless a consensual sexual relationship existed between them when the lawyer-client relationship commenced.

¶ 58. The referee found that Attorney Inglimo engaged in sexual relations with L.K.'s girlfriend while she was doing the same with L.K. The OLR essentially argues that the word "with" in SCR 20:1.8(k)(2) connotes a temporal and spatial connection. According to the OLR, as long as the lawyer and the client are both participating in a sexual act at the same time in the same place, they are having sexual relations "with" each other. In response, Attorney Inglimo relies on the plain language of the rule and argues that the OLR's interpretation would expand the rule beyond its terms.

¶ 59. On this issue, we concur with the referee's conclusion. The definition of sexual relations in SCR 20:1.8(k)(1) connotes conduct directly between the lawyer and the client. When the definition refers to touching, the rule speaks of the lawyer *intentionally* touching the intimate parts of "*a* person," but the subsequent alternative definitional phrase uses the more definitive "*the* person" when referring to a situation in which the lawyer causes the touching to be done to him/her. In addition, to the extent that sexual intercourse also qualifies as "sexual relations" under the definition, such conduct is likewise done intentionally (i.e., not by accident). Further, SCR 20:1.8(k)(2) prohibits a lawyer from having "sexual relations" "with a current client." Thus, the definitional language of SCR 20:1.8(k)(1) and the prohibition of SCR 20:1.8(k)(2) together clearly indicate that the prohibited "sexual relations," whether intercourse or touching, must be *intentionally* done between the lawyer and one particular person, namely the client.

99

¶ 60. Without commenting on the applicability of other Rules of Professional Conduct, we agree with the referee's conclusion that the evidence in the present case did not show that Attorney Inglimo had engaged in "sexual relations" with client L.K in violation of SCR 20:1.8(k)(2). There was no testimony as to precisely what occurred during Attorney Inglimo's encounter with L.K. and his girlfriend. There was no testimony that Attorney Inglimo ever *intentionally* touched L.K.'s intimate parts or caused L.K. to touch his intimate parts. Moreover, there was no testimony that Attorney Inglimo engaged in any form of sexual intercourse with L.K. Thus, because it does not appear that the definitional elements of "sexual relations" have been satisfied, the simple term "with" in the prohibitional phrase in SCR 20:1.8(k)(2) cannot transform this situation into a violation of the rule.

¶ 61. The OLR next asserts that on Count 15 the referee should have considered some level of additional discipline for Attorney Inglimo's failure under SCR 21.15(5) to provide proper notification of his criminal conviction to the OLR and the clerk of this court. The OLR and Attorney Inglimo spend a considerable amount of time arguing about the facts of this issue and their reasons for litigating the issue. As to the OLR's claim on appeal, however, the issue is relatively straightforward. The referee found that Attorney Inglimo failed to provide the required written notice of his conviction to the OLR and to the clerk of this court within five days after the conviction, thereby violating SCR 21.15(5) and SCR 20:8.4(f). Having found a violation of the rule, the referee was not free to disregard the violation in his consideration of discipline. The referee

should have added that violation to the mix when considering the proper level of discipline to recommend. The amount of weight to be given to the violation, however, depends on the facts of the specific case. In any event, it is this court that ultimately decides the appropriate level of discipline, independent of the referee's recommendation. *See In re Disciplinary Proceedings Against Widule,* 2003 WI 34, ¶ 44, 261 Wis. 2d 45, 660 N.W.2d 686. We have factored this violation into our consideration of the proper level of discipline.

¶ 62. Attorney Inglimo has also filed a cross-appeal from the referee's report and recommendation. He asserts that the referee erred in finding (1) that he had failed to produce his client files and (2) that the testimony of other potential witnesses that did not testify might have supported his arguments.

¶ 63. With respect to the client files, Attorney Inglimo asserts that the referee mistakenly believed that Attorney Inglimo had failed to produce his client files to the OLR and to cooperate fully with the OLR's investigation. Attorney Inglimo also states that the referee never made any request to see the files so he should not have faulted Attorney Inglimo for not submitting them as evidence at the disciplinary hearing.

¶ 64. Attorney Inglimo misunderstands the referee's comments about his client files. The referee was not finding an ethical violation because of a failure to produce the relevant client files. He simply was commenting that if Attorney Inglimo had wanted to support some of the factual arguments he was making, he could have submitted portions of his client files. For example, Attorney Inglimo argued that he had properly prepared for L.K.'s criminal trial (Count 2) and that his contacts with K.S. during his representation of M.S. (Count 8) were only business-related. The referee noted

that Attorney Inglimo's files on these client matters could potentially have supported these claims. Since Attorney Inglimo never offered into evidence his files on these matters, however, he had no evidence to support his bald assertions on these points.

¶ 65. Although Attorney Inglimo challenges the referee's comments about his client files, there is no legal issue for this court to resolve. The referee did not find that Attorney Inglimo had failed to turn over requested files, thereby violating an ethical rule. The referee also had no obligation to request Attorney Inglimo's client files. If Attorney Inglimo had wanted parts of those files to be considered by the referee, he had the obligation to offer them into evidence.

¶ 66. The same reasoning holds true with respect to Attorney Inglimo's challenge to the referee's comments (1) on the lack of testimony from judges who had presided over cases handled by Attorney Inglimo or from opposing counsel and (2) on the lack of Attorney Inglimo's probation/treatment records following his criminal conviction. Attorney Inglimo asserts that he provided names and documents to his counsel in this disciplinary proceeding, but for whatever reason his counsel failed to ensure that the evidence was submitted to the referee.

¶ 67. Again, this argument does not raise a legal issue that needs to be resolved by this court. Whether or not Attorney Inglimo's counsel could/should have produced additional evidence/testimony at the disciplinary hearing, it was Attorney Inglimo's responsibility to make sure that everything he wanted the referee and this court to consider was entered into evidence. Moreover, the referee did not use the lack of such evidence as a basis for finding a violation. He simply commented that

Attorney Inglimo had not produced evidence/testimony to back up certain arguments that he made to justify or to mitigate his conduct.

¶ 68. Attorney Inglimo also argues that the referee erred in his factual findings and legal conclusion as to Count 2 regarding his use of marijuana with client L.K. Because the referee believed that he had to find a "nexus" between marijuana usage and legal services provided by Attorney Inglimo to L.K., the referee focused on L.K.'s testimony that Attorney Inglimo had been high during L.K.'s criminal trial and had consequently provided poor representation. Attorney Inglimo argues that expert testimony was necessary as to whether his representation of L.K. was adequate and that L.K. should not have been allowed to testify on that subject because he had no legal expertise. Attorney Inglimo asserts that he had in fact adequately prepared for the trial and had provided competent representation.

¶ 69. This argument is no longer legally relevant. As discussed above, we have concluded that a violation of SCR 20:8.4(b) for using an illegal controlled substance with a client does not require a nexus with deficient legal services. Thus, the fact that Attorney Inglimo used marijuana with client L.K. was sufficient to support a violation. Thus, the referee's conclusion of a violation of SCR 20:8.4(b) on Count 2 is affirmed.

¶ 70. Attorney Inglimo challenges the referee's finding that he had a substantial social relationship with K.S. while he was representing M.S. in a divorce proceeding. Attorney Inglimo's arguments on this subject, however, are basically factual arguments. He does not claim that there was no factual basis for the referee's factual findings. He simply argues that the referee should have believed his version of events. We

103

conclude that the referee's findings of fact regarding Count 8 are not clearly erroneous.

¶ 71. Attorney Inglimo also challenges the referee's finding that his sexual intercourse with K.K. may have materially limited his ability to represent P.K. Attorney Inglimo focuses his argument on his claim that K.K. was not his client at the time of the sexual encounter. He argues that there was no evidence as to any conflict that this encounter created. Attorney Inglimo also asserts that his having sex with K.K. was suggested by P.K. and K.K. He denies the testimony of P.K. and K.K. that K.K. had sex with Attorney Inglimo to pay off an outstanding legal bill.

¶ 72. We find no basis to overturn the referee's factual findings with respect to Count 14. Even if K.K. was not a client at the time that Attorney Inglimo had sexual intercourse with her, it is undisputed that her husband P.K. was a current client at that time. Whether or not the sexual intercourse was payment for prior legal services, we agree with the referee's conclusion that Attorney Inglimo engaged in sexual intercourse with a client's wife in the client's presence for his own personal interests. Attorney Inglimo has not shown that his conduct with K.K. somehow benefited his client P.K. It is self-evident that an attorney's personal interest in having sex with the spouse of a client may materially limit the attorney's representation of that client. Whether or not the client initially approved of the encounter, there is a substantial possibility that the episode is likely to create conflicts between the attorney and the client going forward. Since SCR 20:1.7(b) requires only that the representation "may be materially limited" by the lawyer's personal interests, we agree

104

with the referee's conclusion that Attorney Inglimo's conduct constituted a violation of the rule.

¶ 73. With respect to the appropriate level of discipline, the OLR and Attorney Inglimo both object to the referee's recommendation of an 18–month suspension. The OLR asserts that a three-year suspension is required in this case. It argues that the referee's 18–month suspension was premised on the number of violations he found and would have been greater if additional violations had been considered. The OLR also argues that Attorney Inglimo's misconduct exhibited a serious disregard of the trust placed in him as an attorney on three different fronts: his violation of the drug laws with clients, his failure to treat trust account funds properly, and his engaging in social/sexual relationships with the wives of clients. It notes that prior cases involving drug use have warranted substantial suspensions. *See, e.g., In re Disciplinary Proceedings Against Rabideau,* 102 Wis. 2d 16, 306 N.W.2d 1 (1981) (three-year suspension following convictions for contributing to the delinquency of a minor and possession of marijuana involving supplying marijuana to a former juvenile client); *Broadnax,* 225 Wis. 2d at 442–44 (two-year suspension for using cocaine while subject to order not to do so, misappropriating slightly less than $1,000 from his former law firm, and stealing several compact discs from an employee of his former law firm). Moreover, trust account violations, by themselves, have also resulted in suspensions of more than a few months. *See, e.g., In re Disciplinary Proceedings Against Guenther,* 2005 WI 133, 285 Wis. 2d 587, 700 N.W.2d 260 (eight-month suspension imposed for multiple trust account violations, as well as failure to keep a client reasonably informed and making a misrepresentation to a client). Likewise, a six-month suspension was warranted in a

case involving an attorney's sexual relations with a client and the mother of another client and his false denials of that conduct to a court and the OLR. *In re Disciplinary Proceedings Against Gamino,* 2005 WI 168, 286 Wis. 2d 558, 707 N.W.2d 132. The OLR argues in light of these and other similar prior precedents that an 18–month suspension in the current case, given the number and nature of ethical violations, would unduly depreciate the seriousness of Attorney Inglimo's professional misconduct.

¶ 74. On the other side, Attorney Inglimo argues that we should consider alternatives to suspension. He asserts that all or most of his misconduct is connected to his past use of controlled substances. Therefore, he argues that disciplinary measures focusing on rehabilitation and confirming his abstinence from controlled substances would be appropriate here. Attorney Inglimo asserts that he has been able to remove from his life both controlled substances and the persons who connected him to that lifestyle. He also claims that a suspension would place an unreasonable burden on him due to limited opportunities for other employment and that he has endured a four-year ordeal relating to his criminal conviction and the current disciplinary investigation and proceeding. Finally, Attorney Inglimo notes that he has demonstrated his ability to practice in conformity to the Rules of Professional Conduct during that four-year period.

¶ 75. After considering the referee's report and the arguments of the parties, we conclude that a three-year suspension is necessary to protect the public in this case. Attorney Inglimo showed a disturbing pattern of disregard for the laws of this state and his professional obligations as an attorney. His conduct of

using illegal drugs with his clients and supplying them with drugs encouraged his clients to disobey the law. Moreover, it is also clear that Attorney Inglimo failed to comprehend or appreciate the fiduciary obligation an attorney has to hold the funds of clients or third parties in trust. He routinely used funds belonging to certain clients to cover the expenses of another client or his own personal expenses. Finally, he put his own interests above his duty to promote and protect the interests of his clients, thereby violating one of the core principles of the legal profession. A substantial period of suspension is necessary in this case to impress upon Attorney Inglimo and other lawyers in this state the seriousness of the professional misconduct at issue here and to protect the public from similar misconduct in the future.

¶ 76. We agree with the referee that as a condition of reinstatement Attorney Inglimo should be required to abstain from the use of illegal drugs and to submit to random drug screenings for a period of one year prior to reinstatement. We believe that this is a necessary step to ensure Attorney Inglimo's rehabilitation and to protect the public due to the fact that the use of controlled substances was a substantial factor in the misconduct in this case. We will require as a condition of the reinstatement of his license to practice law that Attorney Inglimo at his own expense submit to monthly random drug screenings for a period of one year prior to the filing of a petition for reinstatement and that he provide the results of those screenings to the OLR. *See Broadnax*, 225 Wis. 2d at 444; *Sandy*, 200 Wis. 2d at 535–36.

¶ 77. We now turn to the issue of costs. On May 1, 2006, this court issued an order in response to Rule

Petition 05–01 (Order 05–01), which related to the assessment of costs against attorneys in disciplinary proceedings, medical incapacity proceedings, and reinstatement proceedings under SCR 22.24. *In Re Amendments to Supreme Court Rules Relating to Cost Assessments in the Lawyer Regulation System,* S.Ct. Order 05–01, 2006 WI 34, 287 Wis. 2d xiii, 714 N.W.2d Ct.R-21. In that order we amended subpart (2) of SCR 22.24. We also created SCR 22.24(1m), which reads as follows:

> 22.14(1m) The court's general policy is that upon a finding of misconduct it is appropriate to impose all costs, including the expenses of counsel for the office of lawyer regulation, upon the respondent. In cases involving extraordinary circumstances the court may, in the exercise of its discretion, reduce the amount of costs imposed upon a respondent. In exercising its discretion regarding the assessment of costs, the court will consider the submissions of the parties and all of the following factors:
>
> (a) The number of counts charged, contested, and proven.
>
> (b) The nature of the misconduct.
>
> (c) The level of discipline sought by the parties and recommended by the referee.
>
> (d) The respondent's cooperation with the disciplinary process.
>
> (e) Prior discipline, if any.
>
> (f) Other relevant circumstances.

¶ 78. Order 05–01, however, expressly stated that the new rule would "apply prospectively to disciplinary proceedings, medical incapacity proceedings, or rein-

statement proceedings filed on or after July 1, 2006." Thus, the new rule does not apply to the present disciplinary proceeding, which was filed in March 2005, although the provisions of the new rule may be instructive in how we approach the cost issue in the present matter.

¶ 79. Moreover, the court's rulings under the version of the rule in effect prior to Order 05–01 are generally consistent with the language of what has now become SCR 22.24(1m). This court has traditionally imposed all of the costs of a disciplinary proceeding on a respondent attorney, even in cases in which the attorney prevailed on some of the counts against him/her. *See, e.g., In re Disciplinary Proceedings Against Konnor,* 2005 WI 37, ¶ 32, 279 Wis. 2d 284, 694 N.W.2d 376; *In re Disciplinary Proceedings Against Polich,* 2005 WI 36, ¶¶ 29–30, 279 Wis. 2d 266, 694 N.W.2d 367; *In re Disciplinary Proceedings Against Trewin,* 2004 WI 116, ¶ 49, 275 Wis. 2d 116, 684 N.W.2d 121; *In re Disciplinary Proceedings Against Pangman,* 216 Wis. 2d 440, 574 N.W.2d 232 (1998).

¶ 80. In this case, the OLR has submitted a request for the imposition of costs in the total amount of $42,400.96. Of that amount, $8,687.49 relate to the referee's time and expenses in presiding over the disciplinary proceeding, which included handling pretrial matters, deciding motions for summary judgment, presiding over an evidentiary hearing, and preparing a lengthy report. The OLR seeks $24,751.54 for counsel fees and disbursements for pre-appellate work and $8,043.04 for counsel fees and disbursements related to the appeals in this matter. The remainder of the costs relate to court reporting fees and other miscellaneous expenses.

¶ 81. The referee recommended that the costs of the disciplinary proceeding to be assessed against Attorney Inglimo should be reduced by one-fifteenth because he viewed Count 15 as only a technical violation of the Supreme Court Rules of Professional Conduct. We decline to follow this recommendation. Although Count 15 was a relatively minor violation in the context of this case, it is clear that Attorney Inglimo did not comply with the rule requiring written notification of his criminal conviction. Nonetheless, he chose to deny the count and to litigate the matter, inviting the OLR's efforts to prove the violation. Consequently, we conclude that the cost amount we approve should not be reduced by one-fifteenth.

¶ 82. Attorney Inglimo has filed an objection to the cost request filed by the OLR. In addition to seeking the one-fifteenth reduction advocated by the referee, which we have now rejected, Attorney Inglimo also seeks an across-the-board one-half reduction of the referee's fees and the OLR's fees and disbursements. Attorney Inglimo's objection incorrectly assumes that the new provisions of SCR 22.14(1m) apply to the present proceeding and argues that the various factors listed there favor a reduction in the amount of costs that should be assessed against him.

¶ 83. With regard to his specific arguments for a one-half reduction in costs, Attorney Inglimo asserts that the OLR over-charged and over-litigated the case against him. He points to the fact that he did not dispute the counts related to trust account violations, which were resolved in the OLR's favor on summary judgment and which the referee did not view as particularly serious. In addition, he notes that the referee found no violation on five of the fifteen counts charged

110

and believed that Count 15 was only a technical violation that did not require any sanction.

¶ 84. Attorney Inglimo also argues that the nature of his misconduct was not very serious, since it involved the use of controlled substances and sexual behavior, as opposed to the conversion of client funds or other offenses directly related to the practice of law. He further asserts that the referee recommended only half of the discipline sought by the OLR and that he has cooperated fully with the disciplinary process.

■■■

¶ 85. Although Attorney Inglimo asserts that the OLR over-litigated this matter, he does not cite specific examples of ways in which the OLR excessively litigated this proceeding. For example, he does not identify which motions, depositions, etc. were unnecessary. Tied to this general claim is his assertion that the OLR did not try to reach a resolution of this matter by agreement prior to the evidentiary hearing, although he had directed his own counsel to seek a negotiated settlement. In this regard, we note that the OLR is not authorized to plea bargain disciplinary matters, although it may enter into stipulations of fact and law and jointly request the imposition of a certain level of discipline that is supported by the particular facts of a matter. *See, e.g., In re Disciplinary Proceedings Against Barrock,* 2007 WI 24, ¶ 5, 299 Wis. 2d 207, 727 N.W.2d 833; *In re Disciplinary Proceedings Against Robinson,* 2007 WI 17, ¶ 5, 299 Wis. 2d 49, 726 N.W.2d 896; *In re Disciplinary Proceedings Against Paul,* 2007 WI 11, ¶ 22, 298 Wis. 2d 629, 726 N.W.2d 253; *In re Disciplinary Proceedings Against Morissey,* 2005 WI 169, ¶ 27, 286 Wis. 2d 579, 707 N.W.2d 142; *In re Disciplinary Proceedings Against Malloy,* 2002 WI 52, ¶ 13, 252 Wis. 2d 597, 644 N.W.2d 663.

¶ 86. Attorney Inglimo does cite several specific items that he asserts should not be recoverable as expenses. For example, he claims that he should not be required to pay for the travel expenses of OLR's retained counsel to travel to Superior, Wisconsin, for meetings that he alleges did not occur. He also argues that he should not have to pay for attorney time for telephone conferences between OLR's retained attorney and its in-house attorneys. Additionally, he claims, without any citation of legal authority, that he should not have to pay for the OLR's retained attorney's mileage, meals and lodging or for photocopies of documents that were used during the prosecution of the matter but were not filed with the referee or this court.

¶ 87. In response, the OLR cites this court's prior cases in which we have said that our general practice is levy the full costs of the disciplinary proceeding on the respondent attorney. It states that this court has rejected on multiple occasions Attorney Inglimo's claim that the cost amount should be reduced because the referee did not find violations on some counts. *See, e.g., Konnor,* 279 Wis. 2d 284, ¶ 32; *Polich,* 279 Wis. 2d 266, ¶¶ 29–30; *In re Disciplinary Proceedings Against Eisenberg,* 144 Wis. 2d 284, 423 N.W.2d 867 (1988). The OLR argues that there is no basis for a claim that any of the counts alleged by the OLR were wholly without prosecutorial merit. *See Konnor,* 279 Wis. 2d 284, ¶ 72 (Abrahamson, C.J., concurring) (noting that the respondent attorney's conduct had caused the prosecution to proceed on all counts and questioning why the costs stemming from the respondent attorney's conduct should be shifted to other attorneys in this state). At bottom, the OLR asserts that there are no "extraordinary circumstances" here that would justify a departure

from the court's standard practice of imposing full costs against the respondent attorney.

¶ 88. With respect to the individual items identified by Attorney Inglimo, the OLR notes that counsel's travel to Superior to meet with witnesses was justified. On one occasion, only one of the two witnesses appeared at the scheduled time. Counsel, however, subsequently located the other witness at her home later that same day. On the other occasion, counsel had scheduled a meeting with another witness and traveled to Superior with the reasonable expectation that the witness would appear for the meeting. Although the witness ultimately failed to appear, the OLR asserts that this was a justifiable expense.

¶ 89. The OLR also argues that it should be entitled to obtain reimbursement for retained counsel's time spent conferring with OLR in-house litigation counsel. It asserts that these telephone conferences were necessary for retained counsel to receive guidance and instruction from OLR's in-house attorneys. Moreover, it notes that, pursuant to its custom, it did not seek reimbursement for any of the time spent by its in-house attorneys during these conferences.

¶ 90. With respect to Attorney Inglimo's objection to the mileage, meals and lodging expenses of OLR's retained counsel, the OLR states that such expenses fall within the definition of "costs" in SCR 22.001(3). That provision defines "costs" as including "fees and expenses of counsel for the office of lawyer regulation."

■■

¶ 91. After considering the submissions of the parties on the cost issue, we conclude that Attorney Inglimo should be required to pay the full costs of this disciplinary proceeding. Attorney Inglimo has not dem-

113

onstrated why we should deviate in this case from our practice of assessing full costs. He has not shown that the OLR over-litigated any part of this case. He has not pointed to particular actions taken by the OLR's counsel that were unnecessary at the time. While we recognize that the total amount of costs in this case is quite large, and while we urge the OLR to be mindful of the impact of its actions on a respondent attorney who will ultimately be faced with a large cost assessment, we have not found a reason to reject any part of the cost request in this case as unnecessary or excessive.

¶ 92. Moreover, much of Attorney Inglimo's support for reducing the amount of costs stems from his assertion that the OLR failed to prove a large number of the counts in its complaint and that other counts on which the OLR prevailed (e.g., Counts 3 through 7 relating to trust account violations) were relatively insignificant violations. First, we have determined that the OLR did prove violations on 14 of the 15 counts in its complaint. With respect to the single count on which we have not found a violation, relating to Attorney Inglimo's three-way sexual encounter with a client and his girlfriend, we cannot say that the OLR's position was without merit. We have simply interpreted the rule at issue in a narrower fashion than the OLR sought. Moreover, we disagree with Attorney Inglimo's position that the professional misconduct at issue in this proceeding was not serious. Failing to hold client trust account funds properly, drawing clients into violations of the criminal laws of this state, and engaging in sexual/social conduct that conflicts with the attorney's duty of loyalty to a client are serious breaches of an attorney's professional obligations.

114

¶ 93. In addition, we do not believe that the specific items identified by Attorney Inglimo fall outside the reasonable expenses that the OLR may incur during its prosecution of a disciplinary matter. Retained counsel traveled to meetings in Superior as a necessary part of obtaining evidence and preparing for an eventual evidentiary hearing. That a witness failed to appear for a scheduled meeting does not mean that retained counsel's actions were unreasonable or unnecessary. Similarly, we find no fault with charging for retained counsel's reasonable amounts of time spent receiving direction from OLR's litigation attorneys. The OLR is charged by this court with enforcing the Rules of Professional Conduct in a fair and consistent manner. It must be able to ensure that its retained counsel is prosecuting a particular action in an appropriate manner, consistent with the office's obligations. Moreover, costs in disciplinary proceedings are not limited to items that could be properly taxed as costs in a civil proceeding. We have no hesitation in allowing the OLR to obtain reimbursement for photocopies that were reasonably made in the normal course of prosecuting a disciplinary action.

¶ 94. At bottom, we note once again that the instant proceeding arose from Attorney Inglimo's own conduct. Thus, it is appropriate that he should shoulder, to the extent he is able, the costs of the proceeding rather than transfer those costs to the other attorneys practicing in this state who have not engaged in misconduct.

¶ 95. Finally, Attorney Inglimo asserts that the amount of costs to be imposed against him greatly exceeds his annual income over the last several years. He argues that since he lives in a rural area and faces

the suspension of his license to practice law in this state, he will not have the ability to obtain employment that will allow him to pay such a large cost amount in a reasonable amount of time. Moreover, he states that he already faces substantial attorney fees from his own counsel in this proceeding and will incur additional expenses in disciplinary proceedings in other states in which he has had a license to practice law.

■■

¶ 96. We will not adjust the amount of costs imposed against Attorney Inglimo based on a claim of lack of assets at this time. It is premature to address that issue now. We first direct Attorney Inglimo to work out an agreement with the OLR by which the cost assessment may be paid over time. *See Konnor,* 279 Wis. 2d 284, ¶ 50 (Abrahamson, C.J., concurring) ("If a lawyer cannot pay the full costs immediately, an agreement may be reached to enable the lawyer to pay the costs over time.") If such an agreement cannot be reached or if Attorney Inglimo is too indigent to be able to make any payments toward the cost assessment, then he may seek relief from the court. We will address a motion premised on an indigency claim only after Attorney Inglimo has attempted in good faith to reach an agreement with the OLR on a payment plan. We are extending the time period for paying the costs in this case from 60 to 180 days to give Attorney Inglimo additional time to work out such an agreement.

¶ 97. IT IS ORDERED that the license of Michael R. Inglimo to practice law in Wisconsin is suspended for a period of three years, effective November 19, 2007.

¶ 98. IT IS FURTHER ORDERED that within 180 days of the date of this order, Michael R. Inglimo shall pay to the Office of Lawyer Regulation the costs of this proceeding. If the costs are not paid within the time

specified and absent a showing to this court of his inability to pay those costs within that time, the license of Attorney Inglimo to practice law in Wisconsin shall remain suspended until further order of the court.

¶ 99. IT IS FURTHER ORDERED that Michael R. Inglimo shall comply with the provisions of SCR 22.26 concerning the duties of a person whose license to practice law in Wisconsin has been suspended.

¶ 100. IT IS FURTHER ORDERED that Michael R. Inglimo abstain from using, possessing, manufacturing or delivering illegal controlled substances during his suspension and that Attorney Inglimo at his own expense submit to monthly random drug screenings for a period of one year prior to the filing of a petition for reinstatement and that he provide the results of those screenings to the OLR.

¶ 101. ANNETTE KINGSLAND ZIEGLER, J., did not participate.